**S. G. E., Appellant,**

v.

**R. L. J., Respondent.**

**No. KCD 27516.**

Missouri Court of Appeals,
Kansas City District.

Sept. 2, 1975.

Philip Eveloff, Muster & Eveloff, St. Joseph, for appellant.

James H. Counts, Morton, Reed & Counts, St. Joseph, and Robert A. Schroeder, Kansas City, for respondent.

Before WASSERSTROM, P. J., and SHANGLER and DIXON, JJ.

PER CURIAM:

Plaintiff obtained a divorce from defendant, her then husband, on September 21, 1973. Custody of the infant child of the parties was awarded to defendant. Two months thereafter, plaintiff filed a motion to modify the decree so as to change custody to her. From a denial of her motion, plaintiff takes this appeal.

In the latter part of 1972, both parties who were then high school students, started dating. Defendant called for plaintiff at her home on various occasions but was not welcome to the parents. In February of

1973, defendant accompanied plaintiff to her home and announced to the parents that plaintiff was pregnant. Thereupon a stormy session occurred. Plaintiff's parents made it abundantly apparent that they opposed marriage, and they suggested abortion.

Defendant utterly opposed the idea of abortion and persuaded plaintiff to marry him and carry the child to term. When plaintiff's parents discovered that the young couple were going to a small town in Kansas to get married, plaintiff's father with other members of the family appeared and made strenuous efforts to stop the marriage. The marriage did, nevertheless, take place.

For a short time after the marriage the parties lived together in an apartment in St. Joseph. Defendant then left for Colorado to take a job while plaintiff returned to her parents' home to reenter high school to complete her senior year. After graduating, plaintiff left to join defendant in Colorado.

By August, plaintiff had reached a crisis. The apartment occupied by the couple in Colorado was very meagerly furnished and the couple did not have the necessities for the baby about to be born. Plaintiff then called her parents who came to Colorado and took her with them to the parental home in St. Joseph.

Shortly after returning to St. Joseph, plaintiff filed petition for divorce. At the same time, apparently at the instance of her parents, she started discussion with a social work agency looking toward placing the anticipated child for adoption.

Plaintiff gave birth to a baby girl on September 10, 1973. When defendant came to the hospital, plaintiff requested defendant's consent to the placing of the child for adoption. In that connection she told him that "she didn't think her parents would accept the baby at their home." Defendant responded that he would not consent to an adoption and that if plaintiff would not take the baby, then he would. The parties then agreed that upon the divorce, custody of the child would be given to defendant.

Eleven days after the birth of the child the divorce case was heard. Plaintiff testified that she did not feel in a position economically, emotionally or physically to have custody of the child, and she further stated that she was willing for the court to award custody to defendant. The decree entered did award custody to defendant and further ordered that defendant keep the child in the home of his parents and that he pay them $100 per month for the child's support and maintenance.

On November 21, 1973, plaintiff filed her motion to change custody. She testified herself and produced the testimony of her parents and others to show that at the time of the birth and continuing through the date of the divorce, plaintiff had been emotionally upset. That evidence was to the effect that she had certain physical problems following the birth, that she was solemn, depressed and given to crying spells, that she was uncommunicative, that she felt confused, that she saw and heard everything but did not comprehend. The testimony on her behalf was further to the effect that she had by the time of the hearing on the motion returned to her old self and was now of the feeling that the child was the paramount thing in her life. Her parents both testified on her behalf in seeking the change in custody and both testified that the child would be fully welcome in their home as part of their family.

Plaintiff also offered some evidence to show that coarse language and vulgar discussions of sexual subjects took place as a common routine in the home of defendant's parents. Plaintiff also attempted to introduce into evidence records of a social work agency which indicated that defendant was the father of an illegitimate child which had been born April 24, 1973, just a few months prior to the birth of the child to plaintiff. These records were ruled inadmissible on the grounds of hearsay.

The decree of the trial court denied the motion to modify upon a finding that "there was no substantial change in circumstances from the time of the rendering of the original Decree of Divorce until this date." The decree further denied plaintiff's application for the allowance of attorney's fees in connection with the motion to modify.

Following that ruling, plaintiff filed a further motion "to vacate, re-open, take additional testimony, correct, amend, or modify judgment, or, alternatively, that the court grant plaintiff a new trial." This motion alleged as grounds that plaintiff had additional evidence to show that defendant had fathered the illegitimate child born April 24, 1973; that defendant and other relatives of his had committed various thefts; that defendant, his mother and aunt drank intoxicants frequently and heavily; that obscene language and discussions of sexual activities normally and frequently occurred in defendant's home; that one of defendant's witnesses had committed perjury at defendant's request; and that plaintiff had been denied visitation rights. Plaintiff requested an evidentiary hearing on this post-trial motion. The court denied that request but nevertheless permitted plaintiff to offer evidence "to make a record * * * so that any court reviewing this record can itself weigh the evidence introduced."

Pursuant to that permission, plaintiff did offer extensive additional evidence, particularly the testimony of a 16 year-old girl who testified she had been impregnated by defendant and that she had borne a baby boy fathered by defendant in April, 1973. This was the child to which reference was made in the social agency records rejected as evidence at the original hearing. Evidence was also offered with respect to the other allegations of the motion for new trial. At the conclusion of the additional testimony, the court formally overruled the motion for new trial.

Plaintiff's principal thrust on this appeal is a challenge to the refusal of the trial court to order a change of custody. She argues in support that: a) since the original award of custody was by consent and not pursuant to any contest, the motion to modify was realistically in the nature of an original custody award and therefore should not be dependent upon any showing of change of conditions citing *Brand v. Brand*, 441 S.W.2d 750 (Mo.App.1969); b) that even if change of conditions is necessary, the evidence does show a change of conditions and that it would be in the best interests of the child to be placed in plaintiff's custody; and c) the court should have considered the additional evidence offered by plaintiff on her motion for a new trial.

█ It is unnecessary to consider the first and third of those contentions, since even under the conventional rule requiring the movant to show a substantial change of circumstances making modification necessary in the best interests of the child, plaintiff did carry that burden of proof. Moreover, that burden was satisfied by the evidence submitted at the original hearing without the necessity of resort to the additional evidence subsequently offered on the motion for new trial.

█ The trial court treated as controlling its finding that there had been no substantial change of circumstances since the time of the rendering of the original decree. That finding cannot stand scrutiny. While deference is owing to the finding by the trial court, nevertheless it is the duty of this court to consider the record de novo on both the law and the evidence. Rule 73.01–3.

During the whole period from February until the birth in September, 1973, plaintiff was immersed in constant turmoil. Starting with her background problem of trying to deal with her own sense of guilt, she quickly had to face in rapid succession a whole series of searing problems. These had to do with whether or not to hasten into marriage, whether to have an abortion, in what way financial requirements could

be met, and whether to attempt to complete her senior year in high school. All of these were matters which produced highly charged conflicts, beginning with the emotional meeting at which defendant advised plaintiff's father and mother of her pregnancy and continuing through the last minute efforts of plaintiff's family to stop the run-away marriage before a Kansas Magistrate. The sense of instability instilled by those problems and events was intensified by plaintiff's shuttling during this period between making her home with her young husband and then with her parents. After first living with defendant in a small apartment in St. Joseph, she returned to the parental home to finish high school, then went to the husband's small apartment in Colorado and then returned again to the parental home in August.

Underlying plaintiff's congery of problems was the basic conflict between her romantic attachment to her young lover and her filial love and respect for her parents. Defendant and plaintiff's parents were on opposite sides of each of the various issues in which plaintiff found herself enmeshed and she was obviously torn between loyalties and teetered back and forth between the arguments presented by the contestants. To this already seething mix was added a still more powerful ingredient. By September 10, plaintiff had to contend also with the cherishing and strong sense of consecration which every young mother feels to the product of her flesh and blood nourished as part of her own body for so many months.

In view of these intense emotional conflicts, over and above the physical discomforts attendant to the child birth, it is no wonder that plaintiff was distraught and sunk in a depressed and tearful silence from the time of the birth to the date of the divorce. However, the evidence shows that in the ensuing two months there came a very drastic change in the whole situation.

The most important factor in the situation existing at the time of the divorce was the attitude of plaintiff's parents, or at the very least what plaintiff discerned to be their attitude, which was a firm refusal on their part to accept her child. By November, 1973, when the motion for change of custody was filed, the situation had made a 180° turn. By this time plaintiff had settled her conflicts and had come to a determination that the care of her child was the paramount thing in her life and that this thought was not a passing thing but was "with me all the time." By this time also her parents had not only become reconciled to the idea of this being their own grandchild, but more than that, they became active, eager participants in plaintiff's efforts to obtain custody and to have the child in their home. Thus, in the intervening two months a change had occurred by which two powerful emotions, mother love and respect for parents, had ceased to be in conflict and now combined together in driving toward the same objective. Moreover, now for the first time plaintiff had a practical way in which to accept custody and give proper care to the child. To say that there had been no material change of condition between September 21 and November 21, 1973, would be an ignoring of the undisputed facts and a refusal to consider the unavoidable conclusions provided by a reasonable insight into human motivations.

All of this serves merely as a preliminary and by way of opening the door to the much more basic consideration of what custody will be for the best interest and welfare of this child, the vital question which the trial court expressly declined to determine. In connection with this question, it can be noted in passing that plaintiff's father is a well established professional man and that both of her parents and her older sister are college educated. Her parents have been successfully married for 27 years. Plaintiff herself has been an excellent student, a leader in school activities, and is now enrolled in college with the objective of becoming a medical technician.

By way of contrast, defendant's mother (in whose home the child is now placed) has

been thrice divorced and is now married for the fourth time. The step-father is a railroad machinist, previously divorced, whose daughter by the first marriage lives in the home. Defendant's mother and sister never completed high school and he, himself, was a very poor student. He has dropped out of high school and is now employed as an unskilled laborer.

■ It seems obvious that the placement of the child with plaintiff and her family would offer to this child vastly more material and cultural advantages than would be available to her with defendant and his family. Nevertheless, the best interest of the child cannot be determined on the basis that one parent is affluent and the other is of more modest means.

■ Let us assume, therefore, that both of these homes are equal and that neither of the parents is disqualified on personal grounds. On that assumption, the rule then becomes applicable that a mother is deemed to be the one best able to care for a child of tender years, especially when the child is a girl. *Eissler v. Eissler,* 468 S.W.2d 217, 221 (Mo.App.1971); *Armstrong v. Armstrong,* 185 S.W.2d 845, 847 (Mo.App.1945); *Hinson v. Hinson,* 518 S.W.2d 330, 332 (Mo.App. 1975).

Any departures from that usual award of custody have been described by this court in *Baker v. Baker,* 475 S.W.2d 130, 133 (Mo. App.1972) as "aberrations from normalcy." That case further holds that where such variance occurs "there must be a finding, evidentially supported, that the best interests and welfare of the children are served by a departure from the normal pattern of family relationships."

No such finding was made by the court below. Nor, if made, would such a finding have been supported by the evidence. Even though we decline to give affirmative preference to the material advantages offered by plaintiff's home, it would be ludicrous to say and it would contradict the record to find that plaintiff's home is in any way inferior to that of defendant or that plain-

tiff's personal qualities are in any way less fitting than those of the defendant. Since there is no factual basis upon which to depart from the normal family pattern recognized by the law, the best interests of the child are served under the *Baker* rule by placing custody with the mother.

■ The only elements in this case which could possibly tend to a ruling against custody by the mother are the facts that at one time very early in her pregnancy she was willing to consider an abortion and that later she did request defendant's consent to placing the child for adoption. With respect to the matter of abortion, it should be noted that this was something within plaintiff's own sole control and she did not need any consent from defendant for that purpose. Her decision not to have an abortion was hers alone, and no possible reason can be seen why it should be held against her that she did briefly consider abortion as a possibility. In any event, the whole answer to this phase of the case was given by the trial court when he correctly observed that "in no manner should plaintiff's wish to have the child aborted or that its custody be placed with others, be a penalty against her present claim."

■ While the trial court's ruling on the matter of custody cannot be accepted, his denial of plaintiff's claim for attorneys' fees stands in better stead. The governing rule is that the allowance of attorneys' fees to a wife is discretionary with the trial court and is to be exercised in view of the circumstances of both parties, including the ability of the husband to pay. *Engler v. Engler,* 455 S.W.2d 36 (Mo.App.1970); *Graves v. Wooden,* 291 S.W.2d 665 (Mo.App.1956); *Papenberg v. Papenberg,* 289 S.W.2d 468 (Mo.App.1956); *Mince v. Mince,* 481 S.W.2d 610, l.c. 612 (Mo.App.1972).

■ On the facts here, a comparison of the circumstances of the parties shows no superior resources by the husband. At the time of the hearing, he was employed at gross wages of $160 to $170 a week. Out of the net payments to him of approximately

$115 per week, at the time of the hearing he was subject to a number of bills being paid in installments and he was paying for the support of the child. At the present time, he is under an obligation to pay the expense of his own legal fees and he will be obligated for the substantial costs on this appeal. Even though plaintiff may be in need herself (which to be true would require disregard of support furnished by her parents), no allowance of an attorney's fee against defendant should be made absent a showing of his financial ability to pay. *Schneider v. Friend,* 361 S.W.2d 308 (Mo. App.1962). The denial of the application for attorneys' fees here was a proper exercise of the trial court's discretion.

There remains for consideration what contribution, if any, should be made by defendant for the support and maintenance of the child. This matter can be better determined by the trial court rather than by this court. The case will be remanded for further hearing and determination of this point.

Reversed and remanded for hearing as to the amount of child support to be awarded appellant and with directions to enter a decree granting custody of the minor child to appellant, determining an appropriate amount of child support and providing rights of visitation.